## KERR v. SOUTHWICK.

### (Circuit Court of Appeals, Second Circuit. January 15, 1903.)

### No. 22.

**1. CANCELLATION OF INSTRUMENTS — GROUNDS — INCHOATE AND INCOMPLETE AGREEMENT.**

Pending a suit by complainant against defendant for infringement of a patent, the parties substantially agreed orally upon a settlement by which complainant was to take a decree establishing the validity of his patent, and for an injunction, and defendant was to pay the costs, and thereafter take a license under the patent, and pay royalties. Defendant dictated a memorandum of the agreement, which was signed by both, and which contained substantially all the things then agreed on, except a provision for the termination of the license in case of a failure to pay royalties. *Held*, that complainant was not entitled to have the instrument canceled in equity after he had taken his decree and defendant had paid the costs, on the ground merely that it was inchoate and incomplete.

**2. DECREE—CONFORMITY TO PLEADINGS—GRANTING RELIEF INCONSISTENT WITH BILL.**

A suit to cancel an instrument by which complainant agreed to grant defendant a license under a patent on the ground of fraud, after a finding therein that the instrument is valid, cannot be retained for the purpose of construing the instrument and enjoining defendant from representing that it operated in itself as a license, since, if a suit for the latter purpose could be maintained at all, it is entirely inconsistent with the cause of action stated in the bill.

Appeal from the Circuit Court of the United States for the District of Connecticut.

For opinion below, see 109 Fed. 482.

John S. Seymour, for appellant.

Henry D. Williams, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. This action was commenced in November, 1899, to set aside, for fraud and undue influence, an agreement between the parties, signed March 27, 1897, which is as follows:

"Memorandum of Agreement between Kerr & Company and G. W. Southwick.

"In consideration of the payment by G. W. Southwick of five per cent. to the said Kerr on the gross cash receipts of wire belt lacing sold by the said Southwick, the said Kerr will grant to the said Southwick license to sell and use wire belt lacing in any part of the United States under Patent No. 456,993, now owned by the said Kerr.

"And it is understood and agreed that the sale of said wire belt lacing sold by the said Southwick, his agents or representatives, is to carry licenses to use it as prescribed in said patent to the purchaser of said wire belt lacing.

"And it is further agreed by the said Kerr that he will at all times use his best efforts to prevent any one from using the belt fastener described, illustrated and claimed in his patent No. 456,993 with any lacing wire other than that made by said Kerr or sold by said Southwick.

"It is also agreed between the parties that if it is mutually agreed to bring suit against any one to maintain the validity of said patent, the said Southwick will pay such portion of the expenses as may be agreed upon between the parties at the time. If through any verdict or decision of the Court the patent in suit is made invalid this agreement is annulled. Any notices issued by the said Kerr, his agents or representatives in relation to the decision of the Courts or decree of injunction against the said G. W. Southwick and

Company will contain mention that the said Southwick is licensed to sell wire belt lacing and make fasteners as prescribed by the patent in suit. It is agreed between the parties that they will maintain a standard price on wire belt lacing and that the limit of discount will be fifty per cent. off list price of $2.00 per hundred feet.

"And the said Southwick agrees to purchase the wire belt lacing from the said Kerr; the price on the same is not to exceed twenty-four cents per pound in fifty foot coils, the. end of each securely tied, and the said Kerr agrees to keep the quality of said wire fully up to the standard and to fill all orders from the said Southwick for wire belt lacing promptly. Any failure on the part of said Kerr to furnish the said Southwick with wire belt lacing, or if at any time the quality is not up to the standard, the said Southwick has a right to purchase wire for the purpose elsewhere.

"Approved and agreed by the parties this 3—27—1897.

"Hugh Kerr.
"George W. Southwick."

This agreement was made in the following circumstances:

The complainant was the owner of letters patent No. 456,993 for improvements in belt fasteners, the belts being fastened at their joints with the lacing wire by means of a new and improved stitch. The complainant was engaged in manufacturing and selling the patented lacing under the name of "Kerr & Co." The defendant was engaged in similar business, but the complainant insisted that the lacing so made and sold infringed his patent and, in 1896, commenced an infringement action against defendant and one Tafft, which proceeded with ordinary diligence until the spring of 1897, when the parties met and, at the suggestion of the defendant, entered into negotiations for a settlement. These negotiations were carried on by the defendant on the one side and by the complainant and his counsel on the other, the principal meetings taking place in the law office of the latter. The complainant also consulted and received advice from other friends in whose judgment he placed confidence. After the matter had been discussed in all its aspects, the main features of the settlement were agreed on as follows:

The complainant was to have a decree sustaining his patent and an injunction against the defendant, who was to pay $250 or $300 costs. The defendant was to receive a license and pay a royalty on gross receipts and any notices published or sent to the trade announcing the decree and injunction were to contain a statement of the defendant's license.

The counsel for complainant, doubting the propriety of asking the court for a decree against a party who was already licensed, declined to draw up a license until after the decree had been actually entered. The defendant naturally desired, before signing a consent that an injunction should issue against him as an infringer, some written assurance that a license would be granted him and accordingly he dictated to a stenographer in the office of complainant's counsel the agreement above quoted and had it copied in duplicate. The parties left the conference and went down in the elevator together and, on reaching the ground floor, the complainant, after reading it, attached his signature to the agreement. "It is the principal object of this suit," says the complainant's brief, "to have this document surrendered up and canceled."

The bill is framed on this theory and the proof is directed towards the establishment of the proposition that the complainant was a weak, feeble, irresponsible old man wholly incapable of transacting business, and absolutely under the domination of the defendant, who is pictured as a shrewd, sharp, plausible and unscrupulous schemer, who prepared the agreement surreptitiously and procured its execution by fraud and undue influence. We do not think that this view is sustained by the proofs.

The evidence is wholly insufficient to sustain a charge of fraud and undue influence. The agreement, so far as it went, was substantially correct. It was not a final settlement; no one has pretended that it was. It was a memorandum which settled the negotiations as far as they had proceeded and they had proceeded almost to a conclusion.

At the argument it was, in substance, conceded that if the agreement had contained a provision for the termination of the license upon failure to pay royalties, it would have been substantially in accord with the previous understanding. That such a license would have been accepted by the defendant but for the unfortunate disagreement between the parties, which took place subsequently, there is no reason to doubt. If either party occupied a position of advantage toward the other it was the complainant and not the defendant. The defendant was alone, the complainant, an intelligent and careful business man, had the advice from the beginning of his lawyer and his friends. The negotiations were carried on in the office of the complainant's solicitor, an accomplished patent lawyer, who certainly would not permit his client to be imposed upon. That he was not imposed upon is evidenced by the oral agreement and by the very memorandum in controversy. So far from being unilateral as against the complainant it would not be difficult to establish the proposition that the advantages preponderated in his favor. He got rid of a vexatious and expensive patent suit, the result of which was uncertain. He obtained a recognition of the validity of his patent from one of his chief competitors in trade. The defendant paid him $300 in cash and agreed to pay him royalties upon all sales in the future.

An agreement, which contains nothing unfair, which is a truthful statement of the understanding between the parties so far as it attempts to state the understanding, cannot be treated as invalid for fraud because it is inchoate and incomplete. We prefer to think that the defendant is not the accomplished rogue he is represented to be and that his conduct on the 27th of March can be accounted for without attributing a sinister motive to his every word and action.

Unquestionably the defendant is a shrewd business man accustomed to prompt action and anxious to economize time. Is it not probable that, tired out by the interminable and indeterminate character of the negotiations and discouraged by the prospect of further delay, he concluded to take the matter in his own hands and procure something from the complainant which would protect him from a decree and an injunction which treated him as an infringer? Some of the subsequent acts of the defendant were unfair and indefensible, but this was after he had been treated as an infringer and when both

parties were in a position of armed neutrality. Each was engaged in an effort to forestall the other with the trade and though some of the letters and circulars of the defendant were untrue those of the complainant did not state the whole truth. They were misleading and furnished some provocation, though, of course, no justification for the defendant's statements. The attempt to prove the defendant guilty of forgery has been wholly unsuccessful.

The complainant ratified the memorandum agreement, by acting pursuant to its terms, and also by retaining the $300 and the decree and injunction. He was also guilty of laches in delaying the commencement of the action for over two years after he had knowledge of the facts upon which his cause of action rests.

We have thus considered the questions of fraud and undue influence as bearing upon the validity of the March agreement in so far as they may legitimately affect the decision of the court upon the issues presented by the defendant's appeal.

We do not deem it necessary to discuss at greater length all of the questions presented by the briefs, for the reason that the validity of the March agreement is only indirectly involved on this appeal. The trial judge did not find it to be fraudulent and did not set it aside. He says:

"The memorandum (March 27, 1897,) does not widely differ from the proposed terms of settlement then under discussion; it was at least approved by complainant when signed. * * * The memorandum ought not to be canceled for it is the defendant's evidence of an agreement for a license which he was at the time certainly, and perhaps hereafter may be entitled to have executed. But plaintiff is entitled to an injunction against defendant's representing that he has a license."

The decree subsequently entered provides for an injunction as stated. The defendant appeals.

The agreement was not decided to be fraudulent; on the contrary it was held valid as an agreement for a license; it was not set aside and the complainant has not appealed.

We have, therefore, a bill praying for a decree declaring fraudulent and void a written agreement and for an injunction based upon and naturally following a finding that the agreement is fraudulent and void. We have also a decree holding the agreement valid, but awarding an injunction precisely as if the agreement were declared void. The sole question in this court is, can such a decree be maintained? We are of the opinion that it cannot be.

The suit entered the Circuit Court as an action to cancel a written instrument on the ground of fraud; it emerged therefrom as an action to restrain unfair competition in trade. Such a transformation in the character of the action cannot be permitted. Having found the agreement valid the only course open to the Circuit Court was to dismiss the bill; it could not retain the action for the purpose of construing the instrument, declaring the defendant's interpretation thereof erroneous and enjoining him from making that interpretation public.

Test it in another way: Suppose that the bill, after reciting that the parties had made an agreement for a formal license and that the defendant was untruthfully representing that he was actually licensed,

had prayed for an injunction restraining him from making such representations; could such a bill be maintained? It is thought not. Equity does not undertake to regulate the conduct of men along such narrow and essentially ethical lines. It does not undertake to prevent the expression of opinions. It may, in rare instances, restrain a false statement of fact, but not the mere expression of an opinion if it have any basis at all on which to rest. Able lawyers differ as to the proper construction of the agreement in question and a layman may be pardoned for thinking he has a license when he is confirmed in that opinion by counsel learned in the law. In any event, the distinction between what the defendant may lawfully say and what he may not say is too shadowy and attenuated to warrant the interference of a court of equity. Although he may not say that he has a formal license signed by the complainant he may say, with perfect propriety, that he has a written agreement for a formal license signed by the complainant. The court cannot undertake to regulate the affairs of trade in such minute details.

If a bill containing the assumed averments cannot be maintained it is manifest, a fortiori, that a bill to cancel a license agreement on the ground of fraud cannot be maintained for such a purpose. The suit is distinctly an action of fraud. The complainant based his right to recovery upon the theory that the agreement of March 27, 1897, was void. He cannot now obtain the same relief upon the theory that it is valid. The two theories are inconsistent.

An examination of the testimony has convinced us that this deplorable controversy might have been avoided if the parties had treated each other with greater consideration and forbearance and, in this respect, both parties are to blame. The complainant, as early as the spring of 1897, regarded the defendant with suspicion and distrust and acted accordingly. It was, therefore, difficult to arrange the very slight differences which existed between them. On the other hand the defendant might have brought about a reconciliation had he desired to do so. This hostile condition continued until the injury to both was irremediable, but we cannot think that the defendant is solely responsible for this result.

It follows that the decree must be reversed with costs and the cause remanded to the Circuit Court with instructions to dismiss the bill without costs.